IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT
OF TEXAS LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 5:20-cv-31 |
| | § | |
| 982.6894 ACRES OF LAND, MORE OR | § | <u>JURY TRIAL DEMANDED</u> |
| LESS, SITUATED IN WEBB COUNTY, | § | |
| STATE OF TEXAS; AND CITY OF | § | |
| LAREDO | § | |
| | § | |
| *Defendants*. | § | |

---

**<u>DEFENDANT CITY OF LAREDO'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR ORDER OF IMMEDIATE POSSESSION</u>**

---

**KRISTINA K. LAUREL HALE**
CITY ATTORNEY FOR THE CITY OF LAREDO

**ALYSSA J. CASTILLON**
Assistant City Attorney for City of Laredo
Federal I.D. No.: 3114327
Texas State Bar No.: 24064568
City of Laredo Office of the City Attorney
1110 Houston Street
Laredo, Texas 78040
Telephone: (956) 791-7319
Facsimile: (956) 791-7494
Email: acastillon@ci.laredo.tx.us
*Attorney in Charge for Defendant City of Laredo*

## TABLE OF CONTENTS

Table of Contents ..................................................................................................... 1

Table of Authorities .................................................................................................. 2

Introduction ............................................................................................................... 4

Summary of Argument .............................................................................................. 4

Argument ................................................................................................................... 5

I.      The power of eminent domain is vested in Congress, which may delegate that power to the executive branch with any limitations it deems fit. ...................... 5

II.     Congress did not delegate to the Government the authority to condemn the City of Laredo's property for the purpose of constructing border fencing. ................................ 8

        A.      The 2018 DHS Appropriations Act that the Government invokes as authority for the taking restricts construction of new fencing to locations other than Laredo. ............................................................ 9

        B.      The Illegal Immigration Reform and Immigrant Responsibility Act does not appropriate funds for the construction of border fencing, either in Laredo or anywhere else. ......................................... 11

        C.      The Declaration of Taking Act does not immunize the Government's taking from judicial challenge. .......................................................... 15

Conclusion and Prayer ............................................................................................ 16

Certificate of Service ............................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*2,953.15 Acres of Land v. United States*,
    350 F.2d 356 (5th Cir. 1965) ................................................................................6, 7

*Abbott v. Beth Israel Cemetery Ass'n of Woodbridge*,
    100 A.2d 532 (N.J. 1953) .........................................................................................6

*Border Patrol Sectors*,
    U.S. CUSTOMS AND BORDER PROTECTION, https://www.cbp.gov/border-
    security/along-us-borders/border-patrol-sectors ....................................................11

*Catlin v. United States*,
    324 U.S. 229 (1944) ............................................................................................7, 15

*Transohio Sav. Bank v. Director, Office of Thrift Supervision*,
    967 F.2d 598 (D.C.Cir.1992) ..................................................................................8

*United States v. 162.20 Acres of Land*,
    639 F.2d 299 (5th Cir. 1981) ..................................................................................7

*W. Union Tel. Co. v. Penn. R.R. Co.*,
    195 U.S. 540 (1904) ............................................................................................6, 7

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................................6, 7

**Statutes and Constitutional Provision**

5 U.S.C. § 706(2) ...........................................................................................................8

8 U.S.C. § 1103(b) .......................................................................................................11

10 U.S.C. § 284 ............................................................................................................14

40 U.S.C. § 3113 .......................................................................................................4, 15

40 U.S.C. § 3114 ...............................................................................................8, 12, 15

40 U.S.C. § 3118 ..........................................................................................................15

Consolidated Appropriations Act, 2017, Pub. L. No. 115–31, div. F, tit. VI, 131
    Stat. 135 (2017) .....................................................................................................12

Consolidated Appropriations Act, 2018, Pub. L. 115-141, div. F, tit. II, 132 Stat.
    348 (2018) ..........................................................................................................9, 13

Consolidated Appropriations Act, 2019, Pub. L. No. 116–6, div. A, tit. II, 133
Stat. 13, 28 § 230(a) (2019) ................................................................................13

Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, div. D, tit. II, 133
Stat. 2317 § 209(a) (2019) ..................................................................................13

U.S. CONST. art. I, § 9, cl. 7...................................................................................11

## INTRODUCTION

On March 4, 2020, the United States of America ("the Government") filed a Complaint in Condemnation, at the request of the Secretary of the Department of Homeland Security ("DHS"). In that Complaint, the Government, through a Declaration of Taking, pursuant to 40 U.S.C. §§ 3113 and 3114, exercised the power of eminent domain to take the property of the City of Laredo. The City waived service of judicial process and has separately filed its Answer to the Complaint. On April 8, 2020, the Government filed its Opposed Motion for Order of Immediate Possession. By this filing, the City of Laredo responds in opposition to that Motion.

In its Complaint, the Government states that "[t]he estate taken" from the City of Laredo is a "temporary, assignable easement" to conduct "investigatory work." Complaint in Condemnation, Schedule E. But the Government's intent to permanently take the City's property for the purpose of constructing a massive border wall is manifest not only from its filings with this Court, but also from its public pronouncements. The Government has indicated that it plans to contract for the construction of a massive border wall in the Laredo Sector, including across the span of the City's parcels, as early as mid-May.

The Government should refrain from binding itself to any such contract pending this Court's resolution of the parties' competing arguments as to whether Congress has granted the Government the requisite construction authority. During the current pandemic crisis, it is particularly urgent that the Government not commit itself to the expenditure of precious taxpayer dollars on an extraordinarily expensive construction project that, as the City will demonstrate below, is congressionally unauthorized.

## SUMMARY OF ARGUMENT

The power of eminent domain is vested in Congress. When Congress delegates that power to officers in the executive branch, it may condition the delegation with limitations as it deems fit.

With respect to the construction of fencing on the southwest border, Congress has been very deliberate in imposing limitations on any powers it decides to confer.

The Government's authority to construct border fencing is controlled by Congress through its annual appropriations to DHS. In its statement of the authority for the taking under the Declaration of Taking Act, the Government has identified the source of its funding, *i.e.*, delegated authority, for this taking: Congress's 2018 DHS Appropriations Act, which the Government represents to the Court "appropriated the funds that shall be used for the taking."

Even a cursory review of that Act shows that it did no such thing; Congress expressly limited funding for new-fencing construction to locations within the "San Diego Sector" and the "Rio Grande Valley Sector." The City of Laredo's property is not in either of these Sectors.  The property is in the Laredo Sector, a location for which Congress did not allocate funding for construction of new fencing. Because Congress has not delegated authority to the Government to take this property for the public purpose on which the Government bases the taking, the Court should deny the Government's motion to take immediate possession of the City's property.

## ARGUMENT

By its Motion, the Government requests this Court to order the City of Laredo "to immediately surrender possession of the condemned estate to the United States." Mot. for Possession at 1. This Court should deny the Government's motion, because Congress has not delegated authority to the Government to condemn the City of Laredo's property, and hence that unauthorized taking is *ultra vires.*

**I.     The power of eminent domain is vested in Congress, which may delegate that power to the executive branch with any limitations it deems fit.**

The Supreme Court has long recognized the fundamental right to property ownership in this country, and the significant threat that the power of eminent domain poses to that right. "The

exercise of the power of eminent domain is against common right. It subverts the usual attributes of the ownership of property. It must, therefore, be given in express terms or by necessary implication." *W. Union Tel. Co. v. Penn. R.R. Co.*, 195 U.S. 540, 569 (1904).

To protect property owners, such as the City of Laredo here, neither the President nor any other officer in the executive branch possesses independent authority to exercise eminent domain. Rather, in keeping with centuries of common law tradition, that power is vested in the legislative branch. "The power of eminent domain is a high sovereign power that has been allotted to the legislative branch of the government since the Magna Carta."[1] The Fifth Circuit has recognized this longstanding tradition, observing that, under our Constitution, "[t]he exercise of the power of eminent domain is vested in the legislative branch of the Government." *2,953.15 Acres of Land v. United States*, 350 F.2d 356, 359 (5th Cir. 1965).

The allocation of eminent domain authority to Congress is not altered by a presidential decree of a national emergency, even in wartime. The Supreme Court shined a spotlight on this fundamental truth in its 1951 *Youngstown* decision, when it considered President Truman's proclamation of a national emergency and issuance of an executive order directing the Secretary of Commerce to take possession of most of the Nation's steel mills during the height of the Korean war. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952).

The Court did not refute that a nationwide steelworkers' union strike justified the President's proclamation of a national emergency: "The indispensability of steel as a component of substantially all weapons and other war materials led the President to believe that the proposed work stoppage would immediately jeopardize our national defense and that governmental seizure

---

[1] *Abbott v. Beth Israel Cemetery Ass'n of Woodbridge*, 100 A.2d 532, 540 (N.J. 1953) (citing Blackstone's Commentaries (Browne's ed.1897), at 39, 44; Jahr, Eminent Domain, (1953), §1, at 1-5).

of the steel mills was necessary in order to assure the continued availability of steel." *Id.* at 583. However, even the indisputable existence of that national emergency did not sway the Court's core holding that "[t]he President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Id.* at 585.

The Court found no such power in the Constitution. It held, first, that the President's order to seize property "cannot properly be sustained as an exercise of the President's military power as Commander in Chief of the Armed Forces." *Id.* at 587. The Court held, second, that "the seizure order [cannot] be sustained because of the several constitutional provisions that grant executive power to the President." *Id.*

Because the Constitution does not confer on the executive branch any authority to exercise the power of eminent domain, that "power, if any . . . must stem . . . from an Act of Congress." *Id.* at 585. Due to the "serious nature of the right of eminent domain," the Supreme Court has held, "it is accompanied and restrained by inexorable limitations." *W. Union*, 195 U.S. at 567. Beyond the basic constitutional limitations, Congress may impose additional statutory limits on the eminent-domain authority that it delegates to the executive branch. The Fifth Circuit has recognized Congress' authority to delegate the power of eminent domain "to be exercised in any manner the Congress sees fit as long as constitutional restraints are not violated." *2,953.15 Acres of Land*, 350 F.2d at 359. When Congress imposes limits, the executive branch is not free to disregard them.  As the Fifth Circuit has explained, "It is clear that a condemnee may challenge 'the validity of the taking for departure from the statutory limits.'" *United States v. 162.20 Acres of Land*, 639 F.2d 299, 303 (5th Cir. 1981) (quoting *Catlin v. United States*, 324 U.S. 229, 240 (1944)).

7

The Administrative Procedure Act authorizes reviewing courts "to hold unlawful and set aside agency action . . . in excess of statutory . . . authority . . . ." 5 U.S.C. § 706(2). "It is 'central to the real meaning of "the rule of law," [and] not particularly controversial' that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so." *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C.Cir.1992) (citations omitted). "Agency actions beyond delegated authority are '*ultra vires*,' and courts must invalidate them." *Id.*

The City of Laredo makes precisely such an *ultra vires* challenge to agency action here. As demonstrated in the following section, Congress delegated border-barrier construction authority to a federal agency – the Department of Homeland Security – through its appropriations in the 2018 DHS Appropriations Act. But, in that Act, Congress limited the Government's authority to construct new fencing to specific locations on the border. The City of Laredo lies outside those locations. Thus, the Government's condemnation of the City's property for a purpose that Congress expressly declined to authorize is beyond the Government's statutory authority. Congress did not delegate to the Secretary of Homeland Security, or any other officer in the executive branch, the power to condemn any of the property owned by the City of Laredo. Thus, the Government's "actions beyond delegated authority are '*ultra vires*,' and [this Court] must invalidate them." *Id.*

## II. Congress did not delegate to the Government the authority to condemn the City of Laredo's property for the purpose of constructing border fencing.

The Declaration of Taking Act ("DTA") requires the Government to file a declaration of taking that "contain[s] or ha[s] annexed to it a statement of the **authority** under which, and the **public use** for which, the land is taken." 40 U.S.C. § 3114(a)(1) (emphasis added). The Government sought to comply with that statutory requirement here by stating the **authority** upon

8

which it relies for the taking in Schedule A to its Complaint in Condemnation and the **public**

**purpose** for the taking in Schedule B. However, Congress did not delegate to the Government the

authority to condemn the City of Laredo's property for the Government's stated purpose of

constructing fencing.

The Government states that the "Public Purpose" for the taking is "to conduct surveying,

testing, and other investigatory work needed to plan the proposed construction of . . . fencing, . . .

to help secure the United States/Mexico border within the State of Texas." Schedule B. As its

"Authority for the Taking" of the City of Laredo's property, the Government cites several Acts of

Congress. Schedule A. None of these Acts delegate power to construct border fencing in the

Laredo Sector, which is where the City of Laredo's property is located.

> **A.** **The 2018 DHS Appropriations Act that the Government invokes as authority for the taking restricts construction of new fencing to locations other than Laredo.**

The heading of Argument Section B of the Government's Motion for Possession reads as

follows: "*The United States Needs Immediate Possession in Order to Meet the Congressional*

*Directive to Construct Fencing in the Laredo Sector.*" Mot. for Possession at 4. But, as

demonstrated below, Congress has not directed the Government to construct fencing in the Laredo

Sector. To the contrary, it has limited the Government's fencing-construction authority to locations

outside of the Laredo Sector.

In Schedule A, the Government invokes as "Authority for the Taking" Congress's 2018

appropriations for the Department of Homeland Security ("2018 DHS Appropriations Act"). *See*

Consolidated Appropriations Act, 2018, Pub. L. 115-141, div. F, tit. II, 132 Stat. 348, 607 (2018).

The Government asserts that this Act "appropriated the funds that shall be used for the taking."

Schedule A. But in the 2018 DHS Appropriations Act, Congress expressly imposed specific,

geographic limitations when it delegated to the Secretary of Homeland Security the authority to

construct barriers along the southwest border. And as noted in § I, when it delegates the power of eminent domain within constitutional parameters, Congress may impose limitations in any manner that it sees fit.

By its express terms, the 2018 DHS Appropriations Act did not appropriate any funds for the construction of new border fencing in the Laredo Sector, which is the "Public Purpose" for which the Government claims it is entitled to take the City of Laredo's property. Schedule B. Rather, the Act expressly limited the use of the appropriated funds to construction of border fencing in geographic locations other than the Laredo Sector.

In the 2018 DHS Appropriations Act, Congress was very precise in designating where along the border the Government could construct new border fencing (as opposed to replacement of already-existing border fencing) with the funds it appropriated:

> Of the amount made available in this Act under "U.S. Customs and Border Protection—Procurement, Construction, and Improvements", $1,571,000,000 shall be available only as follows:
>
> (1) $251,000,000 for approximately 14 miles of secondary fencing, all of which provides for cross-barrier visual situational awareness, along the southwest border in the San Diego Sector;
>
> (2) $445,000,000 for 25 miles of primary pedestrian levee fencing along the southwest border in the Rio Grande Valley Sector;
>
> (3) $196,000,000 for primary pedestrian fencing along the southwest border in the Rio Grande Valley Sector;
>
> (4) $445,000,000 for replacement of existing primary pedestrian fencing along the southwest border;
>
> (5) $38,000,000 for border barrier planning and design; and
>
> (6) $196,000,000 for acquisition and deployment of border security technology.

*Id.* 132 Stat. at 616, § 230(a).

As the plain language of this Act makes clear, the only amounts that Congress appropriated for the construction of new border fencing **limits** such construction to two geographic locations: the "**San Diego Sector**" and the "**Rio Grande Valley Sector**." The City of Laredo's property is not located in either of those Sectors; its property is located entirely in the **Laredo Sector**.[2] Because the Government proposes to construct new border fencing on property that falls outside the geographic limits of the 2018 DHS Appropriations Act, Schedule B, that Act provides no authority for the Government to take the City of Laredo's property, Schedule A.

B.   **The Illegal Immigration Reform and Immigrant Responsibility Act does not appropriate funds for the construction of border fencing, either in Laredo or anywhere else.**

As additional authority for the taking of the City of Laredo's property, the Government cites "the Act of Congress approved September 30, 1996, as Public Law 104-208, Division C, Section 102, 110 Stat. 3009-546, 3009-554-55, as amended and codified at 8 U.S.C. § 1103(b) & note." Schedule A. This Act is known as the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA").

IIRIRA empowers the Attorney General to buy or condemn "any interest in land . . . in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this Act." 8 U.S.C. § 1103(b)(1), (3). But IIRIRA does not itself appropriate the funds necessary for the Government to construct fencing along the border. Through its power of the purse,[3] Congress maintains control over such funding and, hence, over the "public use" that justifies the

---

[2] *See Border Patrol Sectors*, U.S. CUSTOMS AND BORDER PROTECTION, https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors

[3] *See* U.S. CONST. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . .").

Government's congressionally delegated power to condemn properties in specific locations. 40 U.S.C. § 3114(a)(1).

Congress exercises such control through its annual appropriations to DHS. Since the inception of the Trump administration, Congress has made four such annual appropriations to DHS. In each one, Congress has specified the amounts that the Government may expend for construction of specified types of border barriers and, with respect to the construction of new fencing, has limited the locations where such construction may take place.

➢ **2017 DHS Appropriations Act:**

For an additional amount for "Procurement, Construction, and Improvements", $497,400,000, to remain available until September 30, 2021, which shall be available based on the highest priority border security requirements as follows:

(1) **$341,200,000** to **replace approximately 40 miles of existing primary pedestrian and vehicle border fencing** along the southwest border using previously deployed and operationally effective designs, such as currently deployed steel bollard designs, that prioritize agent safety; and to add gates to existing barriers.[4]

➢ **2018 DHS Appropriations Act:**

Of the amount made available in this Act under "U.S. Customs and Border Protection—Procurement, Construction, and Improvements", $1,571,000,000 shall be available only as follows:

(1) **$251,000,000** for **approximately 14 miles of secondary fencing**, all of which provides for cross-barrier visual situational awareness, along the southwest border in the **San Diego Sector**;

(2) **$445,000,000** for **25 miles of primary pedestrian levee fencing** along the southwest border in the **Rio Grande Valley Sector**;

(3) **$196,000,000** for **primary pedestrian fencing** along the southwest border in the **Rio Grande Valley Sector**;

---

[4] Consolidated Appropriations Act, 2017, Pub. L. No. 115–31, div. F, tit. VI, 131 Stat. 135, 433-34 (2017) (emphasis added).

(4) **$445,000,000** for **replacement of existing primary pedestrian fencing** along the southwest border.[5]

➢ **2019 DHS Appropriations Act:**

Of the total amount made available under ''U.S. Customs and Border Protection—Procurement, Construction, and Improvements'', $2,370,222,000 shall be available only as follows:

(1) **$1,375,000,000** is for the construction of **primary pedestrian fencing**, including levee pedestrian fencing, in the **Rio Grande Valley Sector**.[6]

➢ **2020 DHS Appropriations Act:**

Of the total amount made available under "U.S. Customs and Border Protection—Procurement, Construction, and Improvements", $1,904,468,000 shall be available only as follows:

(1) **$1,375,000,000** for the construction of **barrier system** along the southwest border ***

 (b) The amount designated in subsection (a)(1) shall only be available for barrier systems that—

* * *

 (2) are constructed in the **highest priority locations as identified in the Border Security Improvement Plan**.[7]

With respect to Congress's 2020 appropriation to DHS for barrier-system construction, as far as the City of Laredo can determine, DHS has never made publicly available the Border Security Improvement Plan identifying the "highest priority locations" for such construction. However, in its February 2019 letter to the Department of Defense ("DoD") setting forth its

---

[5] Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. F, tit. II, 132 Stat. 348, 616 § 230(a) (2018) (emphasis added).

[6] Consolidated Appropriations Act, 2019, Pub. L. No. 116–6, div. A, tit. II, 133 Stat. 13, 28 § 230(a) (2019) (emphasis added).

[7] Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, div. D, tit. II, 133 Stat. 2317, 2511-12 § 209(a) (2019) (emphasis added).

"Request for Assistance Pursuant to 10 U.S.C. § 284," DHS identified its eleven highest priority

locations, in order of priority:

> The DHS request for assistance includes approximately 218 miles in which DHS requires road construction, the installation of lighting, and the replacement of existing vehicle fencing or dilapidated pedestrian fencing with new pedestrian fencing within the Project Areas. DHS requests that DoD's support under 10 U.S.C. § 284 address the requirements in order of priority as DoD resources allow. **The DHS order of priority is as follows**:

> 1. Yuma Sector Project 1
>
> 2. Yuma Sector Project 2
>
> 3. El Paso Sector Project 1
>
> 4. El Centro Sector Project 1
>
> 5. Tucson Sector Project 1
>
> 6. Tucson Sector Project 2
>
> 7. Tucson Sector Project 3
>
> 8. Tucson Sector Project 4
>
> 9. Yuma Sector Project 3
>
> 10. El Paso Sector Project 2
>
> 11. Tucson Sector Project 5

*Id.* at 10 (emphasis added).

None of these highest-priority project areas encompasses the City of Laredo's property in

the Laredo Sector. In short, by enacting IIRIRA in 1996, Congress did not empower the

Government to construct fencing in the Laredo Sector and to take the City of Laredo's property

for that unauthorized use in 2020.

**C.      The Declaration of Taking Act does not immunize the Government's taking from judicial challenge.**

The only other authority that the Government invokes for the taking of the City of Laredo's property is "40 U.S.C. §§ 3113 and 3114." Schedule A. These provisions are part of the Declaration of Taking Act itself. As demonstrated below, the DTA affords the Government expedited condemnation authority. But it does not immunize the Government's taking from judicial challenge.

The DTA is an extraordinary procedural device inasmuch as it vests title in the Government immediately upon the filing of the declaration of taking:

> On filing the declaration of taking and depositing in the court, to the use of the persons entitled to the compensation, the amount of the estimated compensation stated in the declaration--
>
> (1) title to the estate or interest specified in the declaration vests in the Government; [and]
>
> (2) the land is condemned and taken for the use of the Government.

40 U.S.C. § 3114(b). However, as the Supreme Court has explained, "the statute is not an independent one for condemnation. It provides for no new condemnation proceeding. It merely affords steps ancillary or incidental to suits brought under other statutes." *Catlin*, 324 U.S. at 240.

The DTA "is declared expressly to provide rights which are to be 'in addition to' preexisting rights and are not to 'be construed as abrogating, limiting, or modifying' them." *Id.* (quoting what is now 40 U.S.C. § 3118, with non-substantive modification). The DTA "preserv[es] the owner's preexisting right to question the validity of the taking as not being for a purpose authorized by the statute under which the main proceeding is brought." *Id.* at 241.

Here, the City of Laredo has properly questioned the validity of the Government's taking, as the Supreme Court has made clear it has the right to do. And though the DTA provides the Government with a right of title, it cannot serve as an independent source of condemnation

authority. Because the "statute[s] under which the main proceeding is brought," *id.*, do not authorize the taking of the City of Laredo's property for the purpose of constructing border fencing, this Court should deny the Government's motion to take possession of the City's property.

## CONCLUSION AND PRAYER

For the foregoing reasons, the City of Laredo respectfully prays that this Court deny the Government's Opposed Motion for Order of Immediate Possession.


Dated: May 4, 2020                    Respectfully Submitted,

                                      **KRISTINA K. LAUREL HALE**
                                      CITY ATTORNEY FOR THE CITY OF LAREDO

                                      By:    */s/ Alyssa J. Castillon*
                                             **ALYSSA J. CASTILLON**
                                             Assistant City Attorney for City of Laredo
                                             Federal I.D. No.: 3114327
                                             Texas State Bar No.: 24064568
                                             City of Laredo Office of the City Attorney
                                             1110 Houston Street
                                             Laredo, Texas 78040
                                             Telephone: (956) 791-7319
                                             Facsimile: (956) 791-7494
                                             Email: acastillon@ci.laredo.tx.us
                                             *Attorney in Charge for Defendant City of Laredo*

16

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that, on the 4th day of May, 2020, she electronically submitted a true and correct copy of the foregoing Response in Opposition to Plaintiff's Motion for Order of Immediate Possession with the Court via the CM/ECF system, which will serve a copy on all counsel of record.

*/s/ Alyssa J. Castillon*
ALYSSA J. CASTILLON

## INDEX

1. Complaint in Condemnation Schedule A

2. Complaint in Condemnation Schedule B

3. Complaint in Condemnation Schedule E

4. DHS Request § 284

# APPENDIX 1

## SCHEDULE A

## AUTHORITY FOR THE TAKING

The property is taken under and in accordance with 40 U.S.C. §§ 3113 and 3114, which authorize the condemnation of land and the filing of a Declaration of Taking; the Act of Congress approved September 30, 1996, as Public Law 104-208, Division C, Section 102, 110 Stat. 3009-546, 3009-554-55, as amended and codified at 8 U.S.C. § 1103(b) & note; and the Act of Congress approved March 23, 2018, as Public Law 115-141, div. F, tit. II, 132 Stat. 348, which appropriated the funds that shall be used for the taking.

**APPENDIX 2**

## **SCHEDULE B**

PUBLIC PURPOSE

The public purpose for which said property is taken is to conduct surveying, testing, and other investigatory work needed to plan the proposed construction of roads, fencing, vehicle barriers, security lighting, cameras, sensors, and related structures designed to help secure the United States/Mexico border within the State of Texas.

**APPENDIX 3**

## SCHEDULE E

ESTATE TAKEN

Webb County, Texas

Tracts:  LRT-LRN-1005 thru 1005-9
           LRT-LRN-1005-11 thru 1005-36
           LRT-LRS-1002 thru 1002-5
           LRT-LRS-1002-7 thru 1002-36
           LRT-LRS-1002-38 thru 1002-47
           LRT-LRS-1002-49 thru 1002-63
           LRT-LRS-1002-66 thru 1002-68
           LRT-LRS-1009
           LRT-LRS-1004 thru 1004-3
Owner:  City of Laredo
Acres:  982.6894

The estate taken is a temporary, assignable easement beginning on the date possession is granted to the United States and ending 12 months later, consisting of the right of the United States, its agents, contractors, and assigns to enter in, on, over and across the land described in Schedule C to survey, make borings, and conduct other investigatory work for the purposes described in Schedule B and to access adjacent lands; including the right to trim or remove any vegetative or structural obstacles that interfere with said work; reserving to the landowners, their successors and assigns all right, title, and privileges as may be used and enjoyed without interfering with or abridging the rights hereby acquired; subject to minerals and rights appurtenant thereto, and to existing easements for public roads and highways, public utilities, railroads and pipelines.

# APPENDIX 4



*Executive Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

February 25, 2019

MEMORANDUM FOR:     CAPT Hallock N. Mohler Jr.
                                       Executive Secretary
                                       Department of Defense (DoD)

FROM:                           Christina Bobb
                                       Executive Secretary
                                       Department of Homeland Security (DHS)

SUBJECT:                      Request for Assistance Pursuant to 10 U.S.C. § 284

## I. Overview

As the government department tasked with border security, the Department of Homeland Security (DHS), through U.S. Customs and Border Protection (CBP), is requesting that the Department of Defense assist DHS in its efforts to secure the southern border. The Secretary has directed me to transmit this request for assistance to your attention. This memorandum supersedes the February 22, 2019 version.

In Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended (IIRIRA), 8 U.S.C. § 1103 note, Congress has directed DHS to construct border infrastructure in areas of high illegal entry to deter illegal crossing of both drugs and people into the United States. Pursuant to Section 102, DHS has identified the areas set forth in Section II below as areas of high illegal entry where CBP must take action (the Project Areas).

Within the Project Areas, DHS is experiencing large numbers of individuals and narcotics being smuggled into the country illegally. The Project Areas are also used by individuals, groups, and transnational criminal organizations as drug smuggling corridors. Mexican Cartels continue to remain dominant in these areas, influencing and controlling narcotics and human smuggling operations, within their respective strongholds.

DHS must use its authority under Section 102 of IIRIRA to install additional physical barriers and roads in the vicinity of the United States border in order to deter and prevent illegal crossings within the Project Areas. The construction of border infrastructure within the Project Areas will support DHS's ability to impede and deny illegal entry and drug smuggling activities within the Project Areas.



OSD001680-19/CMD002193-19

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 2

The Project Areas identified are adjacent to some of the most densely populated metropolitan areas of Mexico and are also home to some of the strongest and most violent drug cartels in the world. Deterring and preventing illegal cross-border activity will help stem the flow of illegal narcotics and entries in these areas. Similarly, the improved ability to impede, deny, and be mobile within the Project Areas creates a safer operational environment for law enforcement.

To support DHS's action under Section 102 of IIRIRA, DHS is requesting that DoD, pursuant to its authority under 10 U.S.C. § 284(b)(7), assist with the construction of fences roads, and lighting within the Project Areas to block drug-smuggling corridors across the international boundary between the United States and Mexico.

## II. Capabilities Requested

Within the Project Areas there is existing vehicle fence and dilapidated pedestrian fencing. Vehicle fencing is intended to stop vehicles from illegally entering the United States, but can be climbed over or under by individuals. Pedestrian fencing is intended to prevent and deter individuals and vehicles from illegally crossing into the United States.

DHS requests that DoD assist in the execution of projects, within the Project Areas set forth below, to: (1) replace existing vehicle barriers or dilapidated pedestrian fencing with new pedestrian fencing; (2) construct roads; and (3) install lighting.

The new pedestrian fencing includes a Linear Ground Detection System, which is intended to, among other functions, alert Border Patrol agents when individuals attempt to damage, destroy or otherwise harm the barrier. The road construction includes the construction of new roads and the improvement of existing roads. The lighting that is requested has an imbedded camera that works in conjunction with the pedestrian fence. The lighting must be supported by grid power.

The segments of fence within the Project Areas identified below are situated on federal property. DHS will be responsible for securing, to the extent required, any other real estate interest or instrument that is required for project execution. In the event a real estate interest or instrument that is needed for project execution cannot be obtained for a segment of fence within a Project Area in a time frame that is within the requirements of this request for assistance, the segment may be withdrawn from this request. In addition, DHS will be responsible for any applicable environmental planning and compliance to include stakeholder outreach and consultation associated with the projects.

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 3

**Project Areas:**

**II.A. El Centro Sector**

Within the United States Border Patrol El Centro Sector (El Centro Sector) DHS is requesting that DoD assist by undertaking road construction, by replacing approximately 15 miles of existing vehicle barrier with new pedestrian fencing, and by installing lighting in the specific locations identified below.

The specific Project Area identified below is located in Imperial County, California and has been identified by the Office of National Drug Control Policy (ONDCP) as a High Intensity Drug Trafficking Area (HIDTA). Multiple local transnational criminal organizations known for smuggling drugs into Calexico from Mexico using a variety of tactics, techniques, procedures, and varying concealment methods operate in this area, including *Cartel De Jalisco Nueva Generacíon* (CJNG) as well as remnants of the *Beltran Leyva* Organization and *La Familia Michoacana* organizations. CJNG, based in Jalisco, was previously a faction of the *Sinaloa* Cartel. CJNG broke away from the *Sinaloa* Cartel and has become an established Mexican Cartel. The Mexican government has declared CJNG as one of the most dangerous cartels in the country.

Due to the close proximity of urban areas on both sides of the border, the El Centro Sector suffers from some of the quickest vanishing times – that is, the time it takes to illegally cross into the United States and assimilate into local, legitimate traffic. These quick vanishing times enable the illegal activities of transnational criminal organizations, whether they are smuggling people or narcotics.

Border Patrol's own experience with apprehensions between border crossings bears this out. In fiscal year 2018, there were over 29,000 apprehensions of illegal entrants attempting to enter the United States between border crossings in the El Centro Sector. Also in fiscal year 2018, Border Patrol had approximately 200 separate drug-related events between border crossings in the El Centro Sector, through which it seized over 620 pounds of marijuana, over 165 pounds of cocaine, over 56 pounds of heroin, and over 1,600 pounds of methamphetamine.

The specific Project Area is as follows:

- *El Centro Project 1:*

  - The project begins approximately 10 miles west of the Calexico Port of Entry continuing west 15.25 miles in Imperial County.
  - Start coordinate: 32.63273, -115.922787; End coordinate: 32.652563, -115.662399

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 4

## II.B.  Yuma Sector

Within the United States Border Patrol Yuma Sector (Yuma Sector) DHS is requesting that DoD assist by undertaking road construction, by replacing approximately 36 miles of existing vehicle barrier and approximately 6 miles of dilapidated pedestrian fencing with new pedestrian fencing, and by installing lighting in the specific locations identified below.  The specific areas identified below are located in Yuma County, Arizona.

Yuma County has been identified by the ONDCP as a HIDTA.  Of particular note is the operation of the *Sinaloa* Cartel in this area.  The *Sinaloa* Cartel continues to be the most powerful cartel in the country and controls illicit networks and operations in the United States. Despite the arrest of Joaquin "El Chapo" Guzman-Loera, its narcotics business has continued uninterrupted.  As a result, there have been no significant changes within the *Sinaloa* Cartel's hierarchy, or any changes in the illicit operations conducted by the *Sinaloa* Cartel.

Border Patrol's own experience with apprehensions between border crossings bears this out.  In fiscal year 2018, there were over 26,000 apprehensions of illegal entrants attempting to enter the United States between border crossings in the Yuma Sector.  Also during fiscal year 2018, Border Patrol had over 1,400 separate drug-related events between border crossings in the Yuma Sector, through which it seized over 8,000 pounds of marijuana, over 78 pounds of cocaine, over 102 pounds of heroin, over 1,700 pounds of methamphetamine, and over 6 pounds of fentanyl.

The replacement of ineffective pedestrian fencing in this area is necessary because the older, wire mesh design is easily breached and has been damaged to the extent that it is ineffective.  Additionally, this area is notorious for border violence and narcotics smuggling.  Furthermore, while the deployment of vehicle barrier in the Yuma Sector initially curtailed the volume of illegal cross-border vehicular traffic, transnational criminal organizations quickly adapted their tactics switching to foot traffic, cutting the barrier, or simply driving over it to smuggle their illicit cargo into the United States. Thus, in order to respond to these changes in tactics, DHS now requires pedestrian fencing.

The specific Project Areas are as follows:

- *Yuma Project 1:*

    - The project begins approximately 1 mile southeast of the Andrade Port of Entry continuing along the Colorado River for approximately 5 miles in Yuma County.
    - Start coordinate: 32.704197, -114.726013; End coordinate: 32.642102, -114.764632)

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 5

- *Yuma Project 2:*

    o The project involves the replacement of two segments of primary
      pedestrian fencing in Yuma Sector for a total of approximately 6 miles.
      This includes approximately 2 miles of fencing along the Colorado River.
    o Start coordinate: 32.37755528, -114.4268201; End coordinate:
      32.3579244, -114.3623999;
    o The project also includes replacement of primary pedestrian fencing
      approximately 17 miles east of the San Luis Port of Entry, on the
      Barry M Goldwater Range, continuing east for approximately 4 miles.
    o Start coordinate: 32.51419938, -114.8011175; End coordinate:
      32.49350559, -114.8116619

- *Yuma Project 3:*

    o The project begins approximately 0.4 miles east of the
      Barry M. Goldwater Range continuing approximately 31 miles east
      through the Cabeza Prieta National Wildlife Refuge in Yuma County.
    o Start coordinate: 32.232935, -113.955211; End coordinate: 32.039033,
      -113.33411

### III.C. Tucson Sector

Within the United States Border Patrol Tucson Sector (Tucson Sector) DHS is requesting
that DoD assist by undertaking road construction, by replacing approximately 86 miles of
existing vehicle barrier with new pedestrian fencing, and by installing lighting in the
specific locations identified below. The specific areas identified below are located in
Pima, Cochise, and Santa Cruz Counties, Arizona.

Pima, Cochise and Santa Cruz Counties have been identified by the ONDCP as a
HIDTA. The *Sinaloa* Cartel relies on their local associates to coordinate, direct, and
support the smuggling of illegal drugs and aliens from Mexico to the United States.
Since Arizona is contiguous with the U.S.-Mexico International Boundary, the Tucson
and Phoenix metropolitan areas are major trans-shipment and distribution points for
contraband smuggling. Plaza bosses operate as a *Sinaloa* Cartel leader within their
specific area of operation along the Sonora-Arizona corridor of the U.S.-Mexico
International Boundary.

Border Patrol's own experience with apprehensions between border crossings bears this
out. In fiscal year 2018, there were over 52,000 apprehensions of illegal entrants
attempting enter the United States between the border crossings in the Tucson Sector.
Also in fiscal year 2018 Border Patrol had over 1,900 separate drug-related events
between border crossings in the Tucson Sector, through which it seized over 1,600
pounds of marijuana, over 52 pounds of cocaine, over 48 pounds of heroin, over 902
pounds of methamphetamine, and over 11 pounds of fentanyl.

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 6

In addition, the absence of adequate pedestrian fencing, either due to the presence of vehicle barrier only or ineffective pedestrian designs, in the Tucson sector continues to be particularly problematic as it pertains to the trafficking of illegal narcotics. Rival transnational criminal organizations frequently employ "rip crews" who leverage the remote desert environment and lack of infrastructure to steal one another's illicit cargo resulting in increased border violence.

The terrain also provides high ground to scouts seeking to protect and warn smuggling loads being passed through the area. Transnational criminal organizations have successfully utilized this advantage in furtherance of their illicit activity and for this reason the area is in need of an improved capability to impede and deny illegal crossings or people and narcotics. In addition, the area hosts a number of tourist attractions that allow illegal activity to blend into legitimate activity; avoiding detection and evading interdiction.

The specific Project Areas are as follows:

- *Tucson Project 1:*
    - ○ The project includes replacement of two segments of vehicle barriers. The first segment begins approximately 2 miles west of the Lukeville Port of Entry continuing west approximately 30 miles.
    - ○ Start coordinate: 32.038278, -113.331716; End coordinate: 31.890032, -112.850162
    - ○ The second segment project begins approximately 3 miles east of the Lukeville Port of Entry and continues east approximately 8 miles in Pima County, Arizona.
    - ○ Start coordinate: 31.8648, -112.76757; End coordinate: 31.823911, -112.634298

- *Tucson Project 2:*
    - ○ The project includes approximately 5 miles of primary pedestrian fence replacement around the Lukeville Port of Entry extending from approximately 2 miles west of the port to approximately 3 miles east of the port.
    - ○ Start coordinate: 31.88999921, -112.850162; End coordinate: 31.8648, -112.76757

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 7

- *Tucson Project 3*:

  o The project includes three segments of vehicle barrier replacement
    beginning approximately 18 miles west of the Naco Port of Entry and
    continuing to approximately 25 miles east of the Douglas Port of Entry (or
    approximately 5 miles west of the Arizona/New Mexico state line) for
    approximately 20 miles of non-contiguous vehicle barrier replacement in
    Cochise County, Arizona.
  o Start coordinate: 31.333754, -110.253863; End coordinate: 31.333767,
    -110.250286;
  o Start coordinate: 31.334154, -110.152548; End coordinate: 31.334137,
    -110.147464;
  o Start coordinate: 31.333995, -109.453305; End coordinate: 31.332759,
    -109.129344

- *Tucson Project 4:*

  o The project begins approximately 9 miles east of the Nogales Port of Entry
    and continues eastward for approximately 30 miles with approximately 26
    miles of non-contiguous vehicle barrier replacement in Santa Cruz and
    Cochise Counties, Arizona.
  o Start coordinate: 31.333578, -110.79579; End coordinate: 31.333511,
    -110.775333;
  o start coordinate: 31.33328, -110.70545; End coordinate: 31.333602,
    -110.288665)
  o Note: An additional approximately 0.3 miles of new pedestrian fence
    could be built between the existing segmented vehicle barrier locations to
    fill existing gaps if appropriate real estate interest can be verified

- *Tucson Project 5:*

  o The project includes approximately 2 miles of vehicle barrier replacement
    beginning approximately 4.5 miles east of the Sasabe Port of Entry
    continuing east in six non-continuous segments for approximately 15
    miles in Pima and Santa Cruz Counties, Arizona.
  o Start Coordinate: 31.460175, -111.473171; End Coordinate: 31.459673,
    -111.471584;
  o Start Coordinate: 31.453091, -111.450959; End Coordinate: 31.449633,
    -111.440132;
  o Start Coordinate: 31.440683, -111.412054; End Coordinate: 31.437351,
    -111.40168;
  o Start Coordinate: 31.423471, -111.358336; End Coordinate: 31.422541,
    -111.355444;
  o Start Coordinate: 31.42221, -111.354379; End Coordinate: 31.421321,
    -111.351608;

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 8

       o  Start Coordinate: 31.386813, -111.243966; End Coordinate: 31.385462, -111.239759)

## II.D. El Paso Sector

Within the United States Border Patrol El Paso (El Paso Sector) DHS is requesting that DoD assist by undertaking road construction, by replacing approximately 70 miles of existing vehicle barrier with new pedestrian fencing, and by installing lighting in the specific locations identified below. The specific areas identified below are located in Luna, Hidalgo and Doña Ana Counties, New Mexico. Luna, Hidalgo and Doña Ana Counties have been identified by the ONDCP as a HIDTA.

There are three specific transnational criminal organizations of interest operating in the El Paso Sector - the *Sinaloa* Cartel as well as remnants of the *Juarez* Cartel and the *Beltran Leyva* Organization. In the El Paso Sector the *Sinaloa* Cartel employs a variety of tactics, techniques and procedures depending upon the terrain and environment to move drugs across the border. While the *Sinaloa* Cartel has a strong presence and control of territories at the flanks of the Sector, it does not have full control of the territory throughout the El Paso Sector. The *Juarez* Cartel, traditionally a major trafficker of marijuana and cocaine, has become an active member in opium cultivation and heroin production.

Border Patrol's own experience with apprehensions between border crossings bears this out. In fiscal year 2018, there were over 31,000 apprehensions of illegal entrants attempting to enter the United States between border crossings in the El Paso Sector. Also in fiscal year 2018, Border Patrol had over 700 separate drug-related events between border crossings in the El Paso Sector, through which it seized over 15,000 pounds of marijuana, over 342 pounds of cocaine, over 40 pounds of heroin, and over 200 pounds of methamphetamine.

Although the deployment of vehicle barrier in the El Paso Sector initially curtailed the volume of illegal cross-border vehicular traffic, transnational criminal organizations quickly adapted their tactics switching to foot traffic, cutting the barrier, or simply driving over it to smuggle their illicit cargo into the United States.

Thus, in order to respond to these changes in tactics, CBP now requires pedestrian fencing. Successfully impeding and denying illegal activities or transnational criminal organizations in this area is further complicated by the close proximity of New Mexico Highway 9 to the border. In some cases the highway is less than a half a mile, allowing illegal cross-border traffic to evade detection and apprehension and quickly vanish from the border area.

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 9

The specific Project Areas are as follows:

- *El Paso Project 1:*
  - The project includes 46 miles of vehicle barrier replacement beginning approximately 17.5 miles west of the Columbus Port of Entry continuing east in non-contiguous segments to approximately 35 miles east of the Columbus Port of Entry within the Luna and Doña Ana Counties, New Mexico.
  - Start Coordinate: 31.7837, -107.923151; End Coordinate: 31.783689, -107.679049;
  - Start Coordinate: 31.783672, -107.573919; End Coordinate: 31.783741, -107.038154

- *El Paso Project 2:*
  - The project includes 23.51 miles of Vehicle Barrier replacement in non-contiguous segments within Hidalgo and Luna Counties, New Mexico. The first segment begin approximately 5.1 miles east of the New Mexico/Arizona Border continuing east 4.55 miles.
  - Start Coordinate: 31.332323, -108.962631; End Coordinate: 31.332292, -108.885946;
  - The second segment begins approximately 3 miles west of the Antelope Wells Port of Entry to 3 miles east of the port of entry for 6.12 miles of Vehicle Barrier replacement.
  - Start Coordinate: 31.333368, -108.582412; End Coordinate: 31.333407, -108.47926;
  - The third segment begins approximately 20 miles west of the Columbus Port of Entry extending west 12.84 miles.
  - Start Coordinate: 31.783722, -108.182442; End Coordinate: 31.783708, -107.963193;

## III.    Technical Specifications

As set forth above, DHS requires road construction, installation of lighting, and the replacement of existing vehicle barrier or dilapidated pedestrian fencing with new pedestrian fencing within the Project Areas. DHS will provide DoD with more precise technical specifications as contract and project planning moves forward.

Given DHS's experience and technical expertise, DHS plans to coordinate closely with DoD throughout project planning and execution, to include review and approval of design specifications, barrier alignment and location, and other aspects of project planning and execution.

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 10

## IV.  Sequencing

The DHS request for assistance includes approximately 218 miles in which DHS requires road construction, the installation of lighting, and the replacement of existing vehicle fencing or dilapidated pedestrian fencing with new pedestrian fencing within the Project Areas.  DHS requests that DoD's support under 10 U.S.C. § 284 address the requirements in order of priority as DoD resources allow.  The DHS order of priority is as follows:

1.  Yuma Sector Project 1
2.  Yuma Sector Project 2
3.  El Paso Sector Project 1
4.  El Centro Sector Project 1
5.  Tucson Sector Project 1
6.  Tucson Sector Project 2
7.  Tucson Sector Project 3
8.  Tucson Sector Project 4
9.  Yuma Sector Project 3
10. El Paso Sector Project 2
11. Tucson Sector Project 5

## V.  Funding

DHS requests that DoD provide the above-referenced border fences, roads, and lighting on a non-reimbursable basis as support to block drug smuggling corridors.

DHS will accept custody of the completed infrastructure and account for that infrastructure in its real property records.

DHS will operate and maintain the completed infrastructure.

## VI.  Conclusion

DHS requests DoD assistance under 10 U.S.C. § 284 to construct fences, roads, and to install lighting in order to block drug smuggling corridors in the Project Areas set forth above.  The Projects Areas set forth above are also areas of high illegal entry under IIRIRA § 102(a), and the requested fences, roads, and lighting will assist in deterring illegal crossings in the Project Areas.